PER CURIAM.
This is an appeal from a declaratory statement issued pursuant to section 120.-565, Florida Statutes (1983).
On behalf of Tampa General Hospital, the Hillsborough County Hospital Authority filed a petition for declaratory statement with the Department of Administration, Division of Retirement. In response, the division issued a declaratory statement which reads in pertinent part:
I. THE FACTS
“The Hospital employs approximately 989 nurses of whom 760 are unquestiona-' bly employees properly eligible for, and enrolled in, the Florida Retirement System and over whom there is no dispute. The Hospital’s inquiry concerns the remaining 229 nurses who are members of the so called nursing pool.
“Operating a facility as large as Tampa General Hospital necessarily entails certain staffing difficulties, especially in the area of trained nursing personnel who are habitually in short supply. Because of inability to predict employees’ illnesses, personal emergencies, and a whole gamut of reasons and excuses for personnel unexpectedly not reporting for work, the Hospital has had to seek a secondary source of supply for skilled nursing personnel without whom the business of the Hospital could not continue in the absence of a substantially in *250 creased risk of diminished service to the Hospital’s patients. In some cases, the shortage would be life threatening if not ameliorated.
“Some shortages appear to be predictable while others are more subject to the vicissitudes of daily commerce in the health care industry. These shortages of personnel, both predictable and unpredictable, occur in virtually every cost center within the Hospital in which nursing personnel are employed. To further complicate matters, as the Hospital has so ably drawn to our attention, not only does the demand for nursing personnel within the Hospital change on a daily basis, but the level of expertise required for replacing personnel within the Hospital varies as well. It is not possible, for example, to replace a highly skilled coronary care, intensive care or burn unit nurse with one who is accustomed to and trained for only routine floor care of patients. The Hospital is, therefore, faced with not only a shortage of personnel but with a shortage of very special and specific skills as well.
“Historically, many hospitals, including this hospital, have been able to resort to outside employment agencies or nursing registries which would contract with the hospital to provide the required quantity and quality of personnel needed at any given time. The registries would charge the nurses and the hospitals a fee for their services making it both an expensive way for the Hospital to obtain personnel and an expensive way for the nurses themselves to obtain employment. In 1980 and 1981 when the nursing shortage appeared to be most acute, nurses began contracting directly with hospitals for their services eliminating the intermediate cost of the employment agency. Such a situation presently exists at the hospital here.
“The Hospital organized a ‘staffing office’ which provides to individual nurses who wish employment at the Hospital on something other than a permanent full time basis, the opportunity to work at the Hospital during those periods of time when the nurse may wish to do so. This leaves the individual nurse free to contract with more than one hospital or to work only so many hours during the month as he or she may choose to do so. The arrangement appears beneficial to both parties since the hospital has access to a greater number of employees than it could afford to keep regularly on its payroll, and the individual nurses, being paid more than the Hospital’s regular full time staff members, earn more take home pay than they would otherwise.
“The mechanics of this staffing procedure are significant. Each nurse who wishes to become a member of the nursing pool must undergo a somewhat abbreviated orientation procedure with the Hospital to acquaint them with such mundane necessities as the location of various supplies and services, the various procedures used by the Hospital associated with patient care and otherwise. It appears that no pool nurse can participate in employment with the Hospital before that orientation is complete regardless of the level of skill or the necessity for that nurse’s services.
“Two weeks before the beginning of each calendar month, the Hospital staffing office distributes a blank calendar to each pool nurse for that month with space provided in each day for each of the three shifts used by the Hospital. The pool nurse is requested to indicate his or her availability for service to the Hospital by checking off each shift during which the nurse is willing to work. A copy of that calendar is appended to this Declaratory Statement as Exhibit A. The staffing office also maintains a record of the specific skills possessed by each nurse in the nursing pool so that when a demand for specific skills is evident and a decision is made to utilize nursing pool personnel, the Hospital can match both availability and skill level to its requirements. Presumably, the Hospital is free to reject the services of a specific pool nurse at any given time and the pool nurses are free to cancel their availability upon at least 24 hour notice to the Hospital. A nursing pool nurse may be called to work at the Hospital for one shift or for a prolonged period of time, depend *251 ing on that nurse’s availability and the Hospital’s specific needs. The nurse remains free to contract with other institutions during those periods of time when her services are not required by the Hospital, and many pool nurses often work for more than one institution under similar arrangements. The Hospital attempts to fill specialized skill positions with its own in-house staff first. It will sometimes utilize lesser skilled pool personnel to replace its own highly skilled in-house personnel who are shifted to fill a specialized skill position before seeking the same high skill from a pool nurse.
“The permutations of need, skill level, and availability vary from occasional use to repetitive use. Some departments routinely make use of pool nurses while others rarely use pool nurses. The Hospital has historically considered pool nurses to be something other than part of its regular staff and has not reported these individuals for Florida Retirement System or social security contributions. The pool nurses are paid a slightly higher hourly wage than regular employees.
[[Image here]]
III. DISCUSSION
“It must be recognized at the outset that the Division of Retirement does not have nor does it presently intend to promulgate, a specific definition for ‘pool nurses’. Rather, the applicable Florida Statutes and Administrative Rules must be applied to each individual employment situation to determine whether or not FRS membership is required. With specific regard to Petitioner’s pool nurses, it is recognized that the employment situation varies greatly among individuals within the nursing pool. The Division accepts that many nurses employed in this manner are truly ‘on call’ as described in Rule 1.04(6)(e)7. The Division of Retirement has long interpreted that rule to require some element of being called to work unexpectedly and that the work contemplated would be for brief or limited periods. It must, therefore, also be recognized that some nurses in Petitioner’s nursing pool go far beyond the usual ‘on call’ status and work for considerable periods of time on a more or less regular or nonlimited basis. When a particular employee works in the Hospital beyond four months on a recurring basis, a transition has occurred from ‘on call’ status to employment in a part time regularly established position. Where past performance creates a right to continued employment, a transition has unquestionably occurred. Where employment of pool nurses goes beyond a truly ‘on call’ employment relationship, membership becomes mandatory since Chapter 121 makes no distinction between full or part time employment, except when a pool nurse is given a temporary replacement appointment for the specific purpose of replacing an employee who occupies a regularly established position with the Hospital. In such instance, Rule 1.04(6)(e)(ll) makes the individual ineligible for membership since temporary replacement personnel are not eligible for FRS membership by virtue of that employment as long as they work for six months or less and as long as they perform the duties of an incumbent who is on an approved leave of absence.
“Petitioner’s argument concerning the fact that some nurses are licensed and, therefore, are ‘professional persons’ and thus not eligible for FRS membership by virtue of that licensure has no merit. Professional persons can be employees as well as independent contractors, only the latter being contemplated by Rule 22B-6.01(12).
“In the last analysis the Hospital must apply the above rules and statutes to each of the employed pool nurses in an effort to determine on which side of the continuum that relationship falls. The Division of Retirement declines to interpose itself between the employer and the employee in making that initial determination, but rather acts only as a reviewing authority through the instrumentality of its periodic external audits. Neither does the Division of Retirement maintain any vested interest in whether or not any particular employee is eligible for FRS membership. The critical factor in determining FRS membership *252 is the relationship between the employer and the employee and whether that relationship meets the criteria set out in the above-cited rules and statutory authority.
“Where past performance and employment history over a period of time creates a reasonable expectation of future employment such that each party may have legal rights in the event of breach of that continuing relationship, a transition has most certainly occurred between an employment relationship which demonstrates non-PRS membership status and one which expresses the opposite.
IV. RETIREMENT AND SOCIAL SECURITY COVERAGE DATE
“With regard to when retirement contributions must begin for each FRS member, the law is quite clear. Membership contributions must begin from the first day of employment and must continue thereafter until termination, unless suspension of those contributions is authorized by statute or by rule. Contributions from pool nurses have been requested by the Division of Retirement from July 1, 1979 forward, the date of promulgation of Rule 22B-1.04, and the date that Petitioners have constructive notice of the existence of those guidelines.
“With regard to social security contributions January 1, 1981, is the date from which social security contributions are to be paid.”
The facts set forth in the declaratory statement were essentially taken from the hospital authority’s petition. Therefore, the hospital authority does not question the division’s findings of fact. Likewise, the hospital authority does not attack the validity of the rules that were applied by the division. The hospital authority does contend that the division reached erroneous conclusions from the facts before it. The hospital authority also takes issue with the division’s position that its ruling is applicable to pool nurses employed since July 1, 1979.
At the outset, we find it difficult to evaluate the legal effect of the declaratory statement because it is couched in general terms. In fact, the division suggests that the hospital authority will always have the right later to contest whether a particular nurse should be a member of the retirement system. Yet, the hospital authority fears that if the guidelines contained in the declaratory statement are left untouched, they will become binding in later determinations with respect to particular individuals. The declaratory statement is final agency action. Fla.Stat. § 120.565 (1983). We review its legality pursuant to section 120.68, Florida Statutes (1985). However, in so doing, our decision will necessarily be cast in statements of principle and cannot be deemed to apply to any specific person.
Florida Administrative Code Rule 22B-L-04(5) provides that both full-time and part-time employees who fill regularly established positions must be members of the retirement system. An employment position which will be in existence beyond four consecutive months is deemed to be a regularly established position. Fla.Admin.Code Rule 22B-1.04(5)(b). A position which exists for any part of a month is considered to be in existence for the entire month. Id. An employee filling a temporary position, however, is not eligible for membership in the system. Fla.Admin.Code Rule 22B-1.-04(6). The uncertainty of an employee’s intention to continue employment does not cause that position to be considered temporary. Id. Rule 22B-1.04(6) also provides in part:
A position meeting the definition below shall be a temporary position.
[[Image here]]
(b) A temporary position in a local agency is:
1. An employment position which will not exist beyond four (4) consecutive calendar months; or
2. An employment position which is listed below in (e) regardless of whether it will exist beyond four consecutive months.
The introductory paragraph to rule 22B-1.-04(6)(e) provides:
The following types of positions in a local agency are considered temporary *253 positions for retirement purposes. This is not a complete list of temporary positions and should be used only as a guide, along with the definitions above, in determining if an individual is filling a temporary position.
This subsection, the most pertinent part of which follows, sets forth eleven categories as examples of employees deemed to occupy temporary positions. For example:
1. Casual Laborers (persons who work intermittently when there are specific tasks to be performed).
[[Image here]]
5. Substitute Teachers (persons not on contract called to work intermittently to substitute).
[[Image here]]
7. Persons on Call (employees who are called to work unexpectedly for brief periods and whose employment ceases when the purpose for being called is satisfied).
[[Image here]]
These rules are difficult to apply to the facts at hand. Despite the lack of constancy in positions, rule 22B-1.04(5)(b) could be construed to mean that anytime a pool nurse works a part of a month for more than four consecutive months, at least when performing more or less the same duties, the nurse is occupying a regularly established position. On the other hand, rule 22B-1.04(6)(b)2 provides that employment positions such as those listed under rule 22B-1.04(6)(e) must be deemed temporary even if they extend beyond four months, and persons occupying temporary positions cannot be members of the retirement system. Fla.Admin.Code Rule 22B-1.04(6). Pool nurses have many of the attributes of casual laborers, substitute teachers, and persons on call, all of whom are defined in rule 22B-104(6)(e) as examples of temporary employees.
More than three-fourths of the hospital’s nurses fill established positions. In order to meet its fluctuating patient population, however, the hospital must have the ability periodically to call in additional nurses with specific skills. The nursing pool provides the needed flexibility. The pool nurses possess the indicia of independent contractors. Cf. D.O. Creasman Electronics, Inc. v. State, Department of Labor & Employment Security, 458 So.2d 894 (Fla.2d DCA 1984), and cases cited therein (holding persons under varying factual circumstances to be independent contractors for purposes of the Unemployment Compensation Law). The nurses in the pool have no guarantee that they will be called and have no obligation to work if called. They may avoid their commitment to work a particular shift by giving as little as twenty-four hours’ notice. They can and do work for other hospitals. They are paid more than the regular employees, but they receive no fringe benefits. Obviously, the pool, itself, is never constant because of the turnover of available personnel.
We hold that the pool nurses as described in the declaratory statement occupy temporary positions with the hospital and cannot on the present record be considered as members of the Florida Retirement System. Therefore, it is unnecessary for us to consider the question of retroactivity. We add the caveat that our decision will not sanction the wholesale use of a pool as a vehicle to deprive persons, who are otherwise regularly employed, of the benefits of the Florida Retirement System.
Reversed.
GRIMES, A.C.J., and FRANK and SANDERLIN, JJ., concur.